***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award except for modifications with regard to the type of wheelchair and transportation defendant is obligated to provide.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The defendant is a duly qualified self-insured with Key Risk Management as the Administrator.
3. An employee-employer relationship existed between the parties at all relevant times.
4. The issues for determination are:
1) Did Mr. Strowd sustain a compensable injury by accident on May 31, 2000?
2) If so, what handicap equipment must the employer provide?
 ***********
Based upon the evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 57 years old. He became a wheelchair bound paraplegic following a 1974 motorcycle accident. Plaintiff began working for employer-defendant in 1978.
2. On May 31, 2000, plaintiff was employed by employer-defendant as a Staff Development Specialist. Plaintiff's duties required him to travel throughout the state with video and photographic equipment to produce training materials.
3. On May 31, 2000, plaintiff attended a meeting at the Employment Security Commission in Raleigh, North Carolina. In his past visits to this building he had been able to park in one of the first two handicapped parking spaces that were on relatively flat ground. However, on this date, those spaces were not available, and he had to park in the fourth handicapped parking space, which was located on an incline.
4. Fairley Rachels Bowen, a facilities access specialist for the North Carolina Division of Vocational Rehabilitation Services, measured the grade of the incline where the fourth handicapped parking space was located and found that the incline of this parking space did not meet the government guidelines for a handicapped parking space.
5. After his meeting plaintiff approached his car in the fourth handicapped parking space. Plaintiff wears stiff ankle braces to keep his ankles from collapsing when he must put weight on his feet. As he raised the tailgate of his car, plaintiff locked his braces straight in order to be able to stand, and collapsed his wheelchair. Standing to the left side of the tailgate, locking his braces firmly and facing the downhill slope, which was noncompliant with government regulations for handicapped parking, plaintiff gripped the tailgate for support with his left hand and grasped the wheelchair with his right hand to lift it into the car. Normally, once the wheelchair was in the car, he would shut the tailgate, grip the luggage rack with both hands and shuffle sideways to the driver's door to enter the car. However, on this occasion, given the incline on which plaintiff was standing, as he was lifting the wheelchair into the car, a brace unlocked though his firm grip on the tailgate support prevented him from falling all the way, he felt a sharp pain in his right shoulder as he was simultaneously lifting the wheelchair into the car.
6. Plaintiff was eventually able to lower the tailgate to his car and make his way to the driver's seat. When he returned to his office he reported the incident to his immediate supervisor. Later that day, he reported the incident to the workers' compensation representative.
7. The next day plaintiff went to the office of Dr. Edwin T. Preston, an orthopedic surgeon. Plaintiff continued to treat with Dr. Preston and was eventually diagnosed with a full thickness rotator cuff tear in his right shoulder.
8. If the plaintiff had not been a paraplegic, Dr. Preston would have recommended surgical repair. However, because of his preexisting paraplegia, Dr. Preston does not recommend surgery because plaintiff would be unable to use his right arm for months. Dr. Preston explained, "A paraplegic has to use his arms to get out of bed, to go to the bathroom, to dress, to sit, to stand, drive the wheelchair. I mean the shoulder has got be used." In addition, Dr. Preston testified that "there's a very real chance" plaintiff would tear the rotator again following surgery because of "all the paraplegic activities and the transfer activities" for which plaintiff uses his shoulder. Dr. Preston further testified that the tear will probably get worse over time and lead to an acceleration of the arthritic process of the shoulder.
9. Dr. Preston opined that plaintiff's lifting of the wheelchair while his knee gave way on May 31, 2000 caused the torn right rotator cuff that he diagnosed.
10. Dr. Preston testified that he recommends a motorized wheelchair to help plaintiff remain mobile as his shoulder continues to deteriorate. In addition, a motorized chair would allow plaintiff to work productively for a longer period of time.
11. The only testimony presented regarding motorized wheelchairs was that of Jerry Stalls, the owner of a medical equipment company who is recognized as an expert in rehabilitation technology supply. Mr. Stalls recommended a Permobile motorized wheelchair, which costs at $24,645.00 at retail.
12. Plaintiff sustained an injury by accident on May 31, 2000 when an unusual event occurred as one of his braces unlocked causing him to fall as he was attempting to load his wheelchair into his car as he stood on an incline resulting in a full thickness rotator cuff tear in his right shoulder. Plaintiff has lost no time from his work and continued to work since his injury on May 31, 2000.
13. Due to his injury by accident to his right shoulder, plaintiff should be provided with a motorized wheelchair as opposed to the manual wheelchair he has used in the past. There are many models of motorized wheelchairs that would be suitable for plaintiff's needs.
14. Plaintiff's use of a motorized wheelchair may necessitate that a 2001 Ford van owned by plaintiff be altered for use with the motorized wheelchair.
 ***********
The foregoing findings of fact engender the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of his employment on May 31, 2000. N.C. Gen. Stat. § 97-2(6).
2. The evidence of record establishes a causal relationship between plaintiff's injury by accident of May 31, 2000 and his right shoulder condition. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of the compensable injury as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including being provided with a motorized wheelchair and, if necessary, being provided with modification of the 2001 Ford van owned by plaintiff for use with the motorized wheelchair. Plaintiff is not entitled to be provided with the best motorized wheelchair available, but should be provided with a motorized wheelchair that is suitable to his needs. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay for medical expenses incurred or to be incurred as a result of the compensable injury as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including a motorized wheelchair and, if necessary, modification of the 2001 Ford van owned by plaintiff for use with the motorized wheelchair.
2. Defendant shall pay the costs due the Commission.
This the 8th day of January 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFLED MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER